Honiss W. CANE, Jr., et al.

v.

WORCESTER COUNTY,
MARYLAND, et al.

Civ. No. Y–92–3226.

United States District Court,
D. Maryland.

Feb. 21, 1995.

C. Christopher Brown, Baltimore, MD, and Deborah A. Jeon, Cambridge, MD, for plaintiffs.

Edward H. Hammond, Jr., Ocean City, MD and Benjamin E. Griffith, Cleveland, MI, for defendants.

## MEMORANDUM OPINION

JOSEPH H. YOUNG, Senior District Judge.

On January 6, 1995, the Court ordered Worcester County to adopt the electoral system described in the Court's Opinion.[1] The plaintiffs filed a motion for modification of the judgment and the defendants ("County") filed a motion for a stay pending appeal.

■ A stay pending appeal is appropriate if the party seeking the stay can show that: 1) it will likely prevail on the merits of the appeal, 2) it will suffer irreparable injury if the stay is denied, 3) the other parties will not be substantially harmed, and 4) the public interest will be served by granting the stay. *Long v. Robinson,* 432 F.2d 977, 979 (4th Cir.1970). The County asserts that a stay is warranted because each of these requirements has been satisfied.

■ The County alleges that it will likely succeed on the merits of its claim on appeal because the Court did not sufficiently defer to the County's legislative choices, the Court's remedy was not narrowly tailored, and elections in 1995 would be inappropriate. The County first claims that the Court failed to give due deference to the County's expressed rejection of cumulative voting as part of a remedy, but it spurned all electoral remedies except those that it proposed, all of which were found to be legally inadequate.[2] The Court thus had no choice other than to impose the rejected plan that it found best satisfied the underlying policy choices expressed by the County.[3]

The County asserts that its proposed electoral Plan # 2 was an adequate remedy that should have been accepted by the Court and will likely be accepted on appeal. Specifically, the County argues that Dr. Ronald Weber's testimony that African–Americans would have a functional majority in District 3 of Plan # 2 was uncontradicted and therefore dispositive. It claims that the Court further erred by assuming that all eligible voters do vote and by considering average crossover voting rates rather than those in specific elections.

Dr. Weber was not contradicted by expert testimony at the hearing but was challenged on cross-examination. That cross-examination revealed that Dr. Weber failed to consider African–American crossover rates when evaluating the likelihood of African–American electoral success in District 3. When questioned about African–American crossover rates in the Purnell election,[4] the election that the County urged the Court to consider as the model for African–American electoral success when a "good" African–American candidate runs, Dr. Weber could not recall the figure. A review of Dr. Weber's report in the record reveals African–American cross-over voting to have been at 38.2% in the Purnell election, while the rate for white cross-over voting was 32.2%. In other words, an African–American candidate stands less chance based on crossover figures from the Purnell election than based on average crossover rates.[5]

The County further claims that the Court incorrectly assumed that all eligible voters do vote, but that assumption was for the benefit of the County. The only meaningful statistical data in the record indicates that 77% of eligible white voters register to vote in Worcester County while 32% of African–

1. The United States Supreme Court denied Worcester County's writ of certiorari, *Worcester County, Maryland v. Honiss W. Cane, Jr.,* No. 94–995, —— U.S. ——, 115 S.Ct. 3616, —— L.Ed.2d —— (1995), thereby letting stand the Fourth Circuit's affirmation of the Court's finding of a Voting Rights Act violation.

2. Indeed, prior to the issuance of the Opinion of January 6, 1995, the County indicated that it would appeal whatever electoral system the Court ultimately imposed.

3. These considerations are described in the Court's Opinion of January 6, 1995.

4. Purnell, an African–American, ran for election to the Board in 1986 against a white candidate.

5. On average, African–American voters crossover at essentially the same rate as white voters, whereas African–Americans voted for the white candidate significantly more than white voters opted for Purnell.

American eligible voters do so. If the Court had used those figures, the County's claim of a functional African–American majority in District 3 would have been less credible than assuming that all eligible voters do vote.[6] Dr. Weber did testify that when an African–American candidate runs in a district that is predominately African–American, participation rates are higher for African–Americans than for white voters. Not only is this claim irrelevant to District 3, as African–Americans would still be in a statistical minority, it is wholly unsupported by any data and is directly contradicted by the information available in the record.

The County had ample opportunity to present statistical models based on actual data to prove that African–Americans had a fair chance at electoral success, i.e. a functional majority, in District 3, but they failed to do so. Unsupported assertions of an expert are not compelling when exposed upon cross-examination and thoroughly contradicted by the record.

The County also points to precedent allegedly rejecting cumulative voting as an acceptable remedy to support its claim of a likelihood of success on the merits on appeal. First, it claims that *McGhee v. Granville County,* 860 F.2d 110 (4th Cir.1988), rejected a proportional representation system analogous to cumulative voting. The system was rejected, but not because it was invalid. Rather, the system proposed by the county was found to be a legally acceptable remedy, and the Fourth Circuit found that the district court should have accepted the county's plan. *Id.* at 115. *McGhee* is not relevant to this case, because the County's proposed plans were legally unacceptable.

The County also cites *Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994), to support its claim that the Court's imposition of an electoral system based in part upon cumulative voting may be overturned on appeal. The court in *Nipper* did reject cumulative voting specifically in the context of judicial elections, finding that cumulative voting might "fuel the notion that judges were influenced by

race when administering justice." *Id.* at 1546. The court asserted no broad-based rejection of cumulative voting, and indeed it recognized that such a system "preserve[s] linkage and avoid[s] many of the concerns accompanying a subdistricting plan...." *Id.* A finding that a particular voting scheme in one context is inappropriate clearly does not preclude its use in an entirely different circumstance.

The County claims that the Court's remedy was not narrowly tailored because the "remedial goal in this case ... was not to restructure the County's electoral system into a system of proportional representation, but rather to insure equal electoral opportunity as required by § 2." The County failed to offer a legally acceptable remedial plan and rejected the plans presented by the plaintiffs. As noted above, the Court had no choice but to impose a plan that best addressed the policy concerns expressed by the county and the legal requirements of the Voting Rights Act. There was no more narrowly tailored, legally adequate remedy available.

Finally, the County claims that it has a likelihood of success on the merits because the Court's order of an election in 1995 was inappropriate. The County cites *United States v. City of Houston,* 800 F.Supp. 504 (S.D.Tex.1992), *Gjersten v. Board of Election Commissioners,* 791 F.2d 472 (7th Cir.1986), and *Hamer v. Ely,* 410 F.2d 152 (5th Cir. 1969), as standing for the proposition that special elections should only be ordered in the most extreme cases. These cases are entirely irrelevant, however, as each involves the setting-aside of an election and subsequent special election after a finding that voting rights had been violated. The Court has not ordered that any election be set-aside, and it has not ordered a special or additional election. The 1994 election for the County Board was delayed by this litigation, and the Court ordered that the delayed election take place at the earliest possible date. It would be far more extreme to order a further delay in a regularly scheduled elec-

---

**6.** The County concedes that participation rates are relevant to a determination that a given pop-ulation is a functional majority.

tion than to require that the election be delayed or cancelled altogether.

■ The County asserts that the plaintiffs will not suffer substantial harm because the only effect of a stay, assuming an unsuccessful appeal, is that elections will not be held until November, 1996. However, the Court finds the harm to be far more significant than the County asserts. This case is about the denial of African–Americans of a meaningful right to vote. The County now urges the Court to not only delay African–Americans' first access to fair elections in Worcester County, but also to delay to all citizens of the County their right to a voice in their government. This is a significant harm. Moreover, the County's assertion that *Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir.1979), warns against the denial of a stay which will "utterly destroy the status quo" is irrelevant when, as here, the status quo has already been found to be illegal.

■ The County asserts that the public interest will be harmed by the refusal to grant a stay because, if the appeal is successful, money will have been wasted. The public's interest in timely and fair elections is substantially greater than the expense of establishing an electoral system that may later be held invalid.

■ Similarly, the irreparable injury that the County will allegedly suffer is that it will have to implement a new electoral structure before the Fourth Circuit will rule on the County's appeal. However, implementation of the County's Plan # 2 would have required a new electoral structure to have been put in place prior to the time that the Fourth Circuit would have ruled on the plaintiffs' appeal. The County's reliance on *Wise v. Lipscomb*, 434 U.S. 1329, 98 S.Ct. 15, 54 L.Ed.2d 41 (1977), is misplaced because any remedy chosen would have been a break from the residency district/at-large system used previously by the County. The irreparable injury argument is thus reduced to a claim that the time and expense of implementing a new system will have been wasted if the proposed plan is found invalid. Such an injury is not irreparable and is greatly outweighed by the continued denial of the voting rights of the citizens, of all races, of Worcester County by delaying the 1994 election.

For the same reason the Court will not delay the implementation of the new electoral system to modify the judgment or hold a fairness hearing as requested by the plaintiffs. African–Americans have a significant majority in the Democratic party in the Court's remedial district. African–Americans have thus been given a fair opportunity at electoral success under the terms of the Voting Rights Act.

### ORDER

In accordance with the attached Memorandum, it is this 21st day of February, 1995, by the United States District Court for the District of Maryland, Ordered:

1. That Plaintiffs' Motion for Modification of Judgment or to Schedule a Fairness Hearing BE, and the same IS, hereby DENIED,

2. That Defendants' Application for a Stay of Order Pending Appeal BE, and the same IS, hereby DENIED,

3. That a copy of this Memorandum and Order be mailed to counsel for the parties.