Martin CROMARTIE, et al., Plaintiffs,

v.

James B. HUNT, Jr., in his official capacity as Governor the State of North Carolina, et al., Defendants.

No. 4:96CV104BO(3).

United States District Court,
E.D. North Carolina.
Eastern Division.

March 7, 2000.

Robinson O. Everett, Durham, NC, Martin B. McGee, Williams, Boger, Grady, Davis & Tuttle, Concord, NC, for plaintiffs.

Edwin M. Speas, Jr., N.C. Dept. of Justice, Special Litigation Section, Raleigh, NC, Tiare Bowe Smiley, State Atty. General's Office, Raleigh, NC, for James B. Hunt, Jr., Dennis A. Wicker, Harold J. Brubaker, N.C. State Bd. of Elections, Larry Leake, Dorothy Presser, June K. Youngblood, defendants.

Tiare Bowe Smiley, State Atty. General's Office, Raleigh, NC, for Elaine Marshall, S. Katherine Burnette, Faiger Blackwell, defendants.

Janie Allison Sitton, Attorney, Voting Section, Civil Rights Div., Washington, DC, for U.S., amicus.

Robert Neal Hunter, Jr., Hunter, Johnson, Elam & Benjamin, PLLC, Greensboro, NC, for Cass Ballenger, Howard Coble, Richard Burr, Sue Myrick, Walter Jones, Robin Hayes, Charles Taylor, amicus.

Adam Stein, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, Chapel Hill, NC, for Alfred Smallwood, David Moore, William M. Hodges, Robert L. Davis, Jr., Jan Valder, Barney Offerman, Virginia Newell, Charles Lambeth, George Simkins, intervenor-defendants.

## OPINION

TERRENCE WILLIAM BOYLE, Chief Judge.

This matter is before the Court on remand from the United States Supreme Court's order holding that the underlying case was not suited for summary disposition and ordering this Court to conduct further proceedings. *Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). The underlying action challenges the congressional redistricting plan enacted by the General Assembly of the State of North Carolina on March 31, 1997, contending that it violates the Equal Protection Clause of the Fourteenth Amendment, and relying on the line of cases represented by *Shaw v. Hunt*, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("*Shaw II*"), and *Miller v. Johnson*, 515 U.S. 900, 904, 115 S.Ct. 2475, 2482, 132 L.Ed.2d 762 (1995).

Following the Supreme Court's decision to remand, the parties undertook a new

round of discovery, ending in October, 1999. Between November 29 and December 1, 1999, a trial was held before this Court.

## BACKGROUND

In *Shaw II* the United States Supreme Court held that the Twelfth Congressional District created by the 1992 Congressional Redistricting Plan (hereinafter, the "1992 Plan") was race-based and could not survive the required "strict scrutiny." 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207. The five plaintiffs in *Shaw* lacked standing to attack the other majority-minority district (the First Congressional District under the 1992 Plan) because they were not registered voters in the district. *Id.*

Soon after the Supreme Court ruled in *Shaw II,* three residents of Tarboro, North Carolina, filed the original Complaint in this action on July 3, 1996. These original Plaintiffs resided in the First Congressional District (alternatively, "District 1") as it existed under North Carolina's 1992 Plan. The Plaintiffs charged that the First Congressional District violated their rights to equal protection under the United States Constitution because race predominated in the drawing of the District. The action was stayed pending resolution of remand proceedings in *Shaw v. Hunt,* and on July 9, 1996, the same three Tarboro residents joined the Plaintiffs in *Shaw* in filing an Amended Complaint in that case, similarly challenging District 1.

By Order dated September 12, 1997, the three-judge panel in *Shaw* approved a congressional redistricting plan enacted on March 31, 1997, by the General Assembly as a remedy for the constitutional violation found by the Supreme Court to exist in the Twelfth Congressional District (alternatively, "District 12"). The *Shaw* three-judge panel also dismissed without prejudice, as moot, the plaintiffs' claim that the First Congressional District in the 1992 Plan was unconstitutional. Although it was a final order, the September 12, 1997, decision of the *Shaw* three-judge panel was not preclusive of the instant cause of action, as the panel was not presented with a continuing challenge to the redistricting plan.[1]

On October 17, 1997, this Court dissolved the stay previously entered in this matter. On the same day, two of the original three Plaintiffs, along with four residents of District 12, filed an amended Complaint challenging the 1997 remedial congressional redistricting plan (the "1997 Plan"), and seeking a declaration that the First and Twelfth Congressional Districts in the 1997 Plan are unconstitutional racial gerrymanders. A three-judge panel was designated by order of the Chief Judge of the Fourth Circuit Court of Appeals, dated January 23, 1998.

The Plaintiffs moved for a preliminary injunction on January 30, 1998, and for summary judgment on February 5, 1998. Defendants filed for summary judgment on March 2, 1998, and a hearing on these motions was held on March 31, 1998. On April 3, 1998, a majority of the three-judge panel issued an Order and Permanent Injunction finding that the Twelfth Congressional District under the 1997 Plan was unconstitutional and granting Plaintiffs summary judgment as to that district. The Order and Permanent Injunction also

---

1. In its final Memorandum Opinion the three-judge panel in *Shaw* noted that there was "no substantive challenge to the [1997] plan by any party to this action," and closed by explicitly "noting the limited basis of the approval of the plan that we are empowered to give in the context of this litigation. It is limited by the dimensions of this civil action as that is defined by the parties and the claims properly before us. Here, that means that we only approve the plan as an adequate remedy for the specific violation of the individual equal protection rights of those plaintiffs who successfully challenged the legislature's creation of former District 12. Our approval thus does not—cannot—run beyond the plan's remedial adequacy with respect to those parties and the equal protection violation found as to former District 12." *Shaw v. Hunt,* No. 92–202–CIV–5–BR, at 8 (E.D.N.C. Sept. 12, 1997).

granted Plaintiffs' Motion for Preliminary Injunction and granted Plaintiffs' request for a Permanent Injunction, thereby enjoining Defendants from conducting any primary or general election for congressional offices under the 1997 Plan. Finally, the Court ordered the parties to file a written submission addressing an appropriate time period within which the North Carolina General Assembly would be allowed the opportunity to correct the constitutional defects in the 1997 Plan, and to present a proposed election schedule to follow redistricting which provided for a primary election process culminating in a general congressional election to be held on the date of the previously scheduled general election.

Defendants filed a Motion to Stay the April 3 Order, which was denied by this Court on April 6, 1998. On that date, Defendants appealed the denial of their Motion to Stay to the United States Supreme Court, which upheld this Court's denial on April 13, 1998. *Hunt v. Cromartie*, 523 U.S. 1068, 118 S.Ct. 1510, 140 L.Ed.2d 662 (1998).

On April 14, 1998, this Court issued a Memorandum and Opinion issuing its findings of fact and conclusions of law regarding the April 3, 1998 order and denying Plaintiffs' Motion for Summary Judgment with regard to the First Congressional District under the 1997 Plan. On April 17, 1998, Defendants filed a motion asking the Court to reconsider its April 6 order. On April 21, this Motion to Reconsider was denied.

On April 21, 1998, the Court issued a scheduling order, requiring that the General Assembly either submit a new plan to the Court and the Department of Justice by May 22, 1998 or the Court would assume responsibility for drawing an interim plan. On May 22, 1998, Defendants submitted the 1998 Congressional Redistricting Plain ("the 1998 Plan"). The 1998 Plan contained a clause stating that, in the event that the United States Supreme Court found for the State in its appeal, the 1998 Plan would no longer be ordered and thus North Carolina's congressional districts would revert to the 1997 Plan.

On October 19, 1998, the Court granted a joint motion to stay all proceedings in this action pending a decision by the United States Supreme Court in *Hunt v. Cromartie*, docketed in the Supreme Court on September 16, 1998 as No. 98–450.

On May 17, 1999 the United States Supreme Court entered an order holding that the underlying case was not suited for summary disposition and ordering this Court to conduct further proceedings. *Hunt v. Cromartie*, 526 U.S. 541, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999).

In compliance with the Supreme Court's decision, a three day bench trial was held in this matter, from November 29 to December 1, 1999. Plaintiffs called eight witnesses. Plaintiffs' first witness was Senator Hamilton Horton, a resident of Forsyth County and longtime member of the North Carolina General Assembly. Senator Horton testified as to his belief that Forsyth County and Winston–Salem were split along racial lines in the 1997 Plan and that District 12 was created with a predominantly racial motive.

Plaintiffs' second witness was Representative Steve Wood, a resident of High Point, North Carolina. Representative Wood testified that in 1997 he served in the North Carolina General Assembly in a leadership position. Representative Wood ran for Congress in the Twelfth District under the 1998 Plan and is convinced that the 1997 Plan divided High Point and Guilford County along racial lines for a predominantly racial motive.

As their third witness, Plaintiffs called Representative John Weatherly of King's Mountain, North Carolina, a member of the North Carolina General assembly during the consideration of the 1997 and 1998 redistricting plans who had previously served on a commission considering the State's legislative process. Representative Weatherly testified that he introduced leg-

islation to facilitate the redistricting process through the use of a redistricting commission and that, on the basis of his political and legislative experience, he believed that both Districts 1 and 12 were drawn with a predominantly racial motive.

Plaintiffs' fourth witness was R.O. Everett, a longtime resident of Salisbury, North Carolina who has been active in politics and has run for the state legislature. Mr. Everett testified that he was familiar with the congressional districts in the Salisbury and Rowan County areas and is convinced that District 12 was drawn with a predominantly racial motive.

Plaintiffs' fifth witness was J.H. Froelich Jr., a lifetime resident of High Point, NC who testified that he has been active in state and local politics and believes that Guilford County was divided with a predominantly racial motive in both the 1992 and 1997 Plans and that the 1997 Plan's District 12 was drawn with a predominantly racial motive.

Plaintiffs' sixth witness was Neil Williams, a resident of Charlotte who served on its city council, is familiar with the Mecklenburg County precincts, and ran for Congress in the 1992 Plan's District 9. Mr. Williams testified that he is convinced that Mecklenburg County was divided along racial lines with a predominant racial motive and that the 1997 Plan's District 12 was drawn with a predominantly racial motive.

Plaintiffs' seventh witness was Don Frey of the North Carolina General Assembly's Information Systems Division, who presented statistical data from the General Assembly's database, including relative numbers of persons moved from the 1992 Plan to the 1997 Plan, and current precincts split by the 1997 Plan.

Plaintiffs' eighth and final witness, whose testimony carried over into the second day of trial, was Dr. Ronald Weber of the University of Wisconsin. Dr. Weber testified as an expert political scientist who has studied, consulted on, and testified in many redistricting cases. Referring to maps and other data, Dr. Weber testified that race predominated in the construction of Districts 1 and 12 under the 1997 Plan, and that cities, counties and precincts were divided along racial lines. Dr. Weber concluded that no motivation other than race could adequately explain the legislature's decisions to include, exclude, or split certain precincts.

Beginning on November 30, the second day of trial, the Defendants called four witnesses. Defendants' first witness was Senator Roy Asberry Cooper, III, who testified as to the legislative history and enactment of the 1997 Plan in the North Carolina Senate, focusing on the creation of Districts 1 and 12. Senator Cooper testified that he was unsure whether he could get the 1997 Plan pre-cleared by the Justice Department without creating a majority-minority First District. Senator Cooper's testimony also brought to light a February 10, 1997 email message (the "Cohen–Cooper Email") sent to him by Director of Bill Drafting Gerry Cohen, a state employee charged with the technical aspect of drawing the districts in 1991, 1992, and 1997 Plans. The Cohen–Cooper Email stated, in part, that "By shifting areas in Beaufort, Pitt, Craven and Jones Counties, I was able to boost the minority percentage in the first district from 48.1% to 49.25%. The district was only plurality white, as the white percentage was 49.67%:" (Exhibit 58; Trial Transcript at 438) The email continues, "This was all the district could be improved by switching between the 1st and 3rd unless I went into Pasquotank, Perquimans, or Camden. I was able to make the district plurality black by switching precincts between the 1st and 4th..." (Exhibit 58, Trial Transcript at 438) The Cohen–Cooper email also states that "I [Cohen] have moved Greensboro Black community into the 12th and now need to take bout [sic] 60,000 out of the 12th. I await your direction on this." (Exhibit 58, Trial Transcript at 412)

The senator stated that he did not remember receiving the Cohen–Cooper email and denied having given Cohen "specific instructions." (Trial Transcript at 413, 438)

Additionally, Senator Cooper was questioned about a statement he made to the March 25, 1997 meeting of the House congressional redistricting committee, in which he argued that the 1997 Plan "provides for a fair geographical, racial and partisan balance throughout the state of North Carolina." (Trial Transcript at 429) The senator claimed that the term "partisan balance" referred to maintaining the six-six Democrat–Republican split in the congressional delegation, but denied that the term "racial balance" would refer to maintaining the ten-two balance between whites and African Americans. (Trial Transcript at 429–30) Senator Cooper admitted that race was "one of the factors that was considered" in drafting the 1997 Plan, and that but denied that it was the predominant factor. (Trial Transcript at 430)

Defendants began the third day of trial with their second witness, Representative W. Edwin McMahan, who testified as to the legislative history and enactment of the 1997 Plan in the North Carolina House of Representatives, especially the creation of Districts 1 and 12. Representative McMahan claimed that race was not the predominant factor in the creation of those districts.

Defendants' third witness was Dr. David Peterson of the University of North Carolina at Chapel Hill's Department of Geography and Sciences. Dr. Peterson presented a statistical analysis of data regarding the question whether race predominated over party affiliation in the construction of the 1997 Plan's District 12. Dr. Peterson also discussed the variance between Democratic registration and voting behavior, and analyzed Dr. Weber's reasoning on the predominance of race as a factor in the creation of District 12. In contrast to Dr. Weber, Dr. Peterson's conclusion was that political considerations, rather than race, might possibly account for the legislature's decisions to include, exclude, or split certain precincts.

Defendants' final witness was Gerry Cohen, Director of Bill Drafting for the North Carolina General Assembly. Mr. Cohen testified as to the legislative history and enactment of the 1997 Plan, especially with regard to Districts 1 and 12, as well as the technical aspects of redistricting, including the computer systems used.

## FACTS

As discussed above, in 1992 the State of North Carolina established a new set of proposed congressional districts. This 1992 Plan created two districts, the First and the Twelfth, that were challenged by a group of plaintiffs who claimed that the State had deliberately segregated voters into districts on the basis of race without compelling justification. In *Shaw v. Reno* ("*Shaw I*"), the United States Supreme Court held that this allegation stated a claim for relief under the Equal Protection Clause of the Fourteenth Amendment. 509 U.S. 630, 658, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

On remand, the District Court found that North Carolina's Twelfth District created by the 1992 Plan classified voters by race, but that the plaintiffs lacked standing to challenge the First District. In *Shaw II*, the United States Supreme Court affirmed this finding and further held that the State had not established that its reapportionment scheme was narrowly tailored to serve a compelling state interest, and therefore the 1992 Plan failed the requisite "strict scrutiny" test. 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207.

The North Carolina General Assembly convened in regular session on January 29, 1997, and formed redistricting committees to address the defects found in the 1992 Plan. These newly formed House and Senate Committees aimed to identify a plan which would cure the constitutional defects

and receive the support of a majority of the members of the General Assembly. Affidavit of Senator Roy A. Cooper, III ("Cooper Aff.") ¶ 3. In forming a workable plan, the committees were guided by two avowed goals: (1) curing the constitutional defects of the 1992 Plan by assuring that race was not the predominant factor in the new plan, and (2) drawing the plan to maintain the existing partisan balance in the State's congressional delegation. Cooper Aff. ¶¶ 5, 8, 10, 14; Affidavit of Gary O. Bartlett, Executive Secretary–Director of the State Board of Elections ("Bartlett Aff."), Vol. I Commentary at 9–10.

To achieve the second goal, the redistricting committees drew the new plan (1) to avoid placing two incumbents in the same district and (2) to preserve the partisan core of the existing districts to the extent consistent with the goal of curing the defects in the old plan. Cooper Aff. ¶ 14. The plan as enacted largely reflects these directives: incumbent Congressmen generally do not reside in the same district, and each district retains at least 60% of the population of the old district. Cooper Aff. ¶ 8, Affidavit of Representative W. Edwin McMahan ("McMahan Aff.") ¶ 7.

*I. The Twelfth Congressional District*

District 12 is one of the six predominantly Democratic districts established by the 1997 Plan to maintain the 6–6 partisan division in North Carolina's congressional delegation. District 12 is not a majority-minority district,[2] but 46.67 percent of its total population is African–American. Bartlett Aff., Vol. I Commentary at 10 and 11. District 12 is composed of six counties, all of them split in the 1997 Plan. The racial composition of the parts of the six sub-divided counties assigned to District 12 include three with parts over 50 percent

African–American, and three in which the African–American percentage is under 50 percent. Declaration of Ronald E. Webber ("Webber Dec.") ¶ 18. However, almost 75 percent of the total population in District 12 comes from the three county parts which are majority African–American in population: Mecklenburg, Forsyth, and Guilford counties. Id. The other three county parts (Davidson, Iredell, and Rowan) have narrow corridors which pick up as many African–Americans as are needed for the district to reach its ideal size.[3] Id.

Where Forsyth County was split, 72.9 percent of the total population of Forsyth County allocated to District 12 is African–American, while only 11.1 percent of its total population assigned to neighboring District 5 is African–American. Id. ¶ 20. Similarly, Mecklenburg County is split so 51.9 percent of its total population allocated to District 12 is African–American, while only 7.2 percent of the total population assigned to adjoining District 9 is African–American.

A similar pattern emerges when analyzing the cities and towns split between District 12 and its surrounding districts: the four largest cities assigned to District 12 are split along racial lines. Id. ¶ 23. For example, where the City of Charlotte is split between District 12 and adjacent District 9, 59.47 percent of the population assigned to District 12 is African–American, while only 8.12 percent of the Charlotte population assigned to District 9 is African–American. Affidavit of Martin B. McGee ("McGee Aff."), Ex. L. And where the City of Greensboro is split, 55.58 percent of the population assigned to District 12 is African–American, while only 10.70 percent of the population assigned to District 6 is African–American. Id.

---

**2.** The Twelfth is not a majority-minority district as measured by any of three possible criteria. African–Americans constitute 47 percent of the total population of District 12, 43 percent of the voting age population of the District, and 46 percent of the registered voters in the District. Peterson Aff., at 8.

**3.** An equitably populated congressional district in North Carolina needs a total population of about 552,386 persons using 1990 Census data. Weber Dec. ¶ 39.

An analysis of the voting precincts immediately surrounding District 12 reveals that the legislature did not simply create a majority Democratic district amidst. surrounding Republican precincts. For example, around the Southwest edge of District 12 (in Mecklenburg County), the legislature included within the district's borders several precincts with racial compositions of 40 to 100 percent African–American, while excluding from the district voting precincts with less than 35 percent African–American population, but heavily Democratic voting registrations. Among Mecklenburg County precincts which are immediately adjacent to District 12, but not inside it, are precincts with 58.818 percent of voters registered as Democrats, and precincts that are 56.464 percent Democratic, 54.213 percent. Democratic, 59.135 percent Democratic, 59.225 percent Democratic, 54.498 percent Democratic, 59.098 percent Democratic, 55.72 percent Democratic, 54.595 percent Democratic, 54.271 percent Democratic, 63.452 percent Democratic, and 59.453 percent Democratic. Id., Ex. P. Similarly, Forsyth County precincts that are immediately adjacent to, but not inside, District 12 include precincts with 57.371 percent Democratic registration, 65.253 percent Democratic registration, 65.747 percent Democratic registration, 65.747 percent Democratic registration, 76 percent Democratic registration, 55.057 percent Democratic registration, 55.907 percent Democratic registration, 56.782 percent Democratic registration, 55.836 percent Democratic registration, and 60.113 percent Democratic registration. Id., Ex. O. Finally, District 12 was drawn to exclude precincts with 59.679 percent Democratic registration, 61.86 percent Democratic registration, 58.145 percent Democratic registration, 62.324 percent Democratic registration, 60.209 percent Democratic registration, 56.739 percent Democratic registration, 66.22 percent Democratic registration, 57.273 percent Democratic registration, 55.172 percent Democratic registration, and 63.287 percent Democratic registration, all in Guilford County. Id., Ex. N.

On the North Carolina map, District 12 has an irregular shape and is barely contiguous in parts. Its Southwest corner lies in Mecklenburg County, very close to the South Carolina border, and includes parts of Charlotte. The District moves North through Rowan County and into Iredell County. There it juts West to pick up parts of the City of Statesville. More than 75 percent of the Statesville population that is included in District 12 is African–American, while only 18.88 percent of the population of Statesville excluded from District 12 is African–American. McGee Aff., Ex. L. From Statesville, the District moves East into Rowan County. There it dips to the South to include Salisbury, before turning to the Northeast and entering Davidson County and the City of Thomasville. Over 41 percent of the populations of Salisbury and Thomasville that are included in District 12 are African–American, while only 15.39 and 9.55 percent, respectively, of those that are excluded from the District are African American. Id. The District makes a northwesterly incursion into Forsyth County to include parts of Winston–Salem, where 77.39 percent of the population within District 12 is African–American, and only 16.06 percent of the population left out is African–American. Id. The District moves to the East and narrows dramatically before opening up again to include the predominantly African–American parts of Greensboro, where the District ends.

Objective, numerical studies of the compactness of congressional districts are also available. In his report, "An Evaluation of North Carolina's 1998 Congressional Districts," Professor Gerald R. Webster, one of the Defendants' expert witnesses, presents · statistical analyses of "comparator compactness indicators" for North Carolina's congressional districts under the 1997 Plan. In measuring the districts' dis-

persion compactness[4] and perimeter compactness,[5] Professor Webster offers two of the "most commonly recognized and applied" compactness indicators. Webster, at 13 (citing Pildes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election–District Appearances After Shaw v. Reno, 92 Mich. L.Rev. 483, 571–573, table 6 (1993) (hereinafter, "Pildes & Niemi")); *and see Bush v. Vera,* 517 U.S. 952, 959–60, 116 S.Ct. 1941, 1952, 135 L.Ed.2d 248 (1996) (citing Pildes & Niemi compactness factors as support-ing evidence for holding three Texas congressional districts unconstitutional).

In discussing the relative normalcy of various compactness measures, Pildes and Niemi suggest that a "low" dispersion compactness measure would be equal to or less than 0.15. Pildes & Niemi, at 564. They suggest that a "low" perimeter compactness measure is equal to or less than 0.05. Id. North Carolina's Twelfth Congressional District under the 1997 Plan has a dispersion compactness indicator of 0.109 and a perimeter compactness indicator of 0.041. Webster, at table 3. These figures are much lower than the mean compactness indicators for North Carolina's twelve congressional districts under the 1997 Plan. The average dispersion compactness indicator for the State is 0.354, and the average perimeter compactness indicator is 0.192. Id. The next lowest dispersion compactness indicator after District 12 is the 0.206 in the Fifth Congressional District, and the next lowest perimeter compactness indicator is the First Congressional District's 0.107. Id.

Thus, it is clear that even after the changes detailed above, the primary characteristic of the Twelfth District is its "racial archipelago," stretching, bending and weaving to pick up predominantly African–American regions while avoiding many closer and more obvious regions of high Democratic registration, but low African–American population.

## II. The First Congressional District

District 1 is another predominantly Democratic district established by the 1997 Plan. Unlike District 12, it is a majority-minority district, based on percentages of the total population of the District,[6] as 50.27 percent of its total population is African–American. Id., Vol. I Commentary at 10. District 1 is composed of ten of the 22 counties split in drawing the statewide 12 district 1997 Plan. Weber Dec. ¶ 16. Half of the twenty counties represented in District 1 are split. Id. Of the ten sub-divided counties assigned to District 1, four have parts with over 50 percent African–American population, four others have parts with over 40 percent African–American population, and two others have parts with over 30 percent African–American population. Id., ¶ 17.

In each of the ten counties that are split between District 1 and an adjacent district, the percent of the population that is African–American is higher inside the district than it is outside the district, but within the same county. Id., ¶ 19 and Table 2. The disparities are less significant than in the county splits involving District 12. Id., Table 2. For example, where Beaufort County is split between Districts 1 and 3,

4. "Dispersion compactness" measures the geographic "dispersion" of a district. To calculate this a circle is circumscribed around a district. The reported coefficient is the proportion of the area of the circumscribed circle which is also included in the district. This measure ranges from 1.0 (most compact) to 0.0 (least compact). Webster, at 14.

5. "Perimeter compactness" is based upon the calculation of the district's perimeter. The reported coefficient is the proportion of the area in the district relative to a circle with the same perimeter. This measure ranges from 1.0 (most compact) to 0.0 (least compact). Webster, at 14. The equation used here is $(((4 \times \Pi) \times \text{Area of district}) \div (\text{District's Perimeter2}))$. Webster, at table 3.

6. While 50.27 percent of the total population of District 1 is African–American, only 46.54 percent of the voting age population is African–American, based on the 1990 census data. Bartlett Aff., Vol. I Commentary at 10.

37.7 percent of the total population of Beaufort County allocated to District 1 is African–American, while 22.9 percent of the total population of Beaufort County assigned to District 3 is African–American.

Similarly, nine of the 13 cities and towns split between District 1 and its neighboring districts are split along racial lines. Id., ¶ 22. For example, where the City of New Bern is split between District 1 and adjacent District 3, 48.27 percent of the population assigned to District 1 is African–American, while 24.49 percent of the New Bern population assigned to District 3 is African–American. McGee Aff., Ex. L.

Viewed on the North Carolina map, District 1 is not as irregular as District 12. In the North, it spans 151.2 miles across, from Roxboro, Person County, in the West, to Sunbury, Gates County, in the East. Affidavit of Dr. Alfred W. Stuart ("Stuart Aff."), table 1. It is shaped roughly like the state of Florida, although the protrusion to the South from its "panhandle" is only approximately 150 miles long (to Goldsboro, Wayne County, with two irregularities jutting into Jones, Craven, and Beaufort Counties). Cooper Aff., attachment. These irregularities surround the peninsular extension of the Third Congressional District from the East, allowing the incumbent from the previous Third Congressional District to retain his residence within the boundaries of the same district, and avoiding placing two incumbents in District 1.

The "comparator compactness indicators" from District 1 are much closer to the North Carolina mean compactness indicators than are those from District 12. For example, District 1 has a dispersion compactness indicator of 0.317 and a perimeter compactness indicator of 0.107. Webster, at table 3. This dispersion compactness indicator is not significantly lower than the State's mean indicator of 0.354, and is higher than the dispersion compactness indicators of Districts 12 (0.109), 9 (0.292), and 5 (0.206). Id. It may be noted

that Districts 5 and 9 are next to, and necessarily shaped by, District 12. District 1 has a perimeter compactness indicator of 0.107, which is lower than North Carolina's mean perimeter compactness indicator (0.192), but much higher than Pildes and Niemi's suggested "low" perimeter compactness indicator (0.05). District 1's perimeter compactness indicator is also much higher than that of District 12 (0.041). Id.

## DISCUSSION

### I. Applicable Law and Standard of Review

The Equal Protection Clause of the United States Constitution provides that no State "shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14, § 1. The United States Supreme Court explained in *Miller v. Johnson*, 515 U.S. 900, 904, 115 S.Ct. 2475, 2482, 132 L.Ed.2d 762, that the central mandate of the Equal Protection Clause "is racial neutrality in governmental decisionmaking." Application of this mandate clearly prohibits purposeful discrimination between individuals on the basis of race. *Shaw v. Reno*, 509 U.S. 630, 642, 113 S.Ct. 2816, 2824, 125 L.Ed.2d 511 (1993) ("*Shaw I*") (citing *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976)).

As the Supreme Court recognized, however, the use of this principle in "electoral districting is a most delicate task." *Miller*, 515 U.S. at 905, 115 S.Ct. at 2483. Analysis of suspect districts must begin from the premise that "[l]aws that explicitly distinguish between individuals on racial grounds fall within the core of [the Equal Protection Clause's] prohibition." *Shaw I*, 509 U.S. at 642, 113 S.Ct. at 2824. Beyond that, however, the Fourteenth Amendment's prohibition "extends not just to explicit racial classifications," *Miller*, 515 U.S. at 905, 115 S.Ct. at 2483, but also to laws, neutral on their face, but "unexplainable on grounds other than race," *Arling-*

*ton Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

In challenging the constitutionality of a State's districting plan, the "plaintiff bears the burden of proving the race-based motive and may do so either through 'circumstantial evidence of a district's shape and demographics' or through 'more direct evidence going to legislative purpose.'" *Shaw II*, 517 U.S. at 904, 116 S.Ct. at 1900 (quoting *Miller*, 515 U.S. at 916, 115 S.Ct. at 2488). In the final analysis, the plaintiff must show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* (quoting *Miller*, 515 U.S. at 916, 115 S.Ct. at 2488).

Once a plaintiff demonstrates by a preponderance of the evidence that race was the predominant factor in redistricting, the applicable standard of review of the new plan is "strict scrutiny." Thus, in *Miller* the Supreme Court held that strict scrutiny applies when race is the "predominant" consideration in drawing the district lines such that "the legislature subordinate[s] race-neutral districting principles ... to racial considerations." 515 U.S. at 916, 115 S.Ct. at 2488. Under this standard of review, a State may escape censure while drawing racial distinctions only if it is pursuing a "compelling state interest." *Shaw II*, 517 U.S. at 908–09, 116 S.Ct. at 1902.

However, "the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose." *Wygant v. Jackson Bd. of Ed.*, 476 U.S. 267, 280, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986) (opinion of Powell, J.). As the Supreme Court required in *Shaw II*, where a State's plan has been found to be a racial gerrymander, that State must now "show not only that its redistricting plan was in pursuit of a compelling state interest, but also that its districting legislation is narrowly tailored to achieve that compelling interest." 517 U.S. at 908–09, 116 S.Ct. at 1902.

We are cognizant of the principle that "redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt." *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) (citations omitted). "A State should be given the opportunity to make its own redistricting decisions so long as that is practically possible and the State chooses to take the opportunity. When it does take the opportunity, the discretion of the federal court is limited except to the extent that the plan itself runs afoul of federal law." *Lawyer v. Dep't of Justice*, 521 U.S. 567, 577–78, 117 S.Ct. 2186, 2193, 138 L.Ed.2d 669 (1997) (internal citations omitted).[7] Thus, when

---

**7.** The dissent charges that we "ignore[ ] the principles of federalism which require federal courts to exercise restraint," and alludes to the dangers of "judicial activism." This is a disturbing accusation, as a federal court cannot shrink away from the enforcement of the United States Constitution and federal law. The standard of equal protection under law established in the latter half of the 20th century is the direct result of federal courts' defense of constitutional principles in the face of state resistance. We would point our distinguished colleague to the words of the late Judge Frank Johnson:

It must be emphasized that, when governmental institutions fail to make ... judgment and decisions in a manner which comports with the constitution, federal

courts have a duty to remedy the violation. In summary, it is my belief that the judicial activism which has generated so much criticism is, in most cases, not activism at all. Courts do not relish making such hard decisions and certainly do not encourage litigation on social and political problems.

But the federal judiciary in this country has the paramount and the continuing duty to uphold the law. When a "case or controversy" is properly presented, the court may not shirk its sworn responsibility to uphold the Constitution and laws of the United States. The courts are bound to take jurisdiction and decide the issues, even though those decisions result in criticism. The basic strength of the federal judiciary has been, and continues to be, its independence from political and social pressures.

the federal courts declare an apportionment scheme unconstitutional-as the Supreme Court did in *Shaw II*—it is appropriate, "whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan. The new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution." *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497.

## II. The Twelfth Congressional District

■ As noted above, the final decision of the three-judge panel in *Shaw* only approved the 1997 Congressional Redistricting Plan "as an adequate remedy for the specific violation of the individual equal protection rights of those plaintiffs who successfully challenged the legislature's creation of former District 12." *Shaw v. Hunt,* No. 92–202–CIV–5–BR, at 8 (E.D.N.C. Sept. 12, 1997). This panel must thus decide whether the 1997 Plan's Twelfth District violates the equal protection rights of the Plaintiffs who live within the district and challenge its constitutionality.

In holding that District 12 under the 1992 Plan was an unconstitutional racial gerrymander, the Supreme Court in *Shaw II* noted, "[n]o one looking at District 12 could reasonably suggest that the district contains a 'geographically compact' population of any race." 517 U.S. at 916–17, 116 S.Ct. at 1906. The *Shaw II* Court thus struck the old District 12 as unconstitutional as a matter of law. In redrawing North Carolina's congressional districts in 1997 the General Assembly was, of course, aware that District 12 under the 1992 Plan had been declared unconstitutional; curing the constitutional deficiencies was one of the legislature's declared goals for the redistricting process. Cooper Aff. ¶¶ 5, 8, 10, 14.

Defendants now argue that the changes in District 12 between the 1992 and 1997 Plans are dramatic enough to cure it of its constitutional defects. They point to the fact that the new District 12 has lost nearly one-third (31.6 percent) of the population from the 1992 district and nearly three-fifths (58.4 percent) of the land. These numbers neither advance the Defendants' argument nor end the Court's inquiry. As Defendants themselves note, the Court's role is limited to determining "whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights-that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place." *McGhee v. Granville County,* 860 F.2d 110, 115 (4th Cir.1988) (citing *Upham v. Seamon,* 456 U.S. 37, 42, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982)). A comparison of the 1992 District 12 and the present District is of limited value here. The issue in this case is whether District 12 in the 1997 Plan violates the equal protection rights of the voters residing within it.

In *Shaw I,* the Supreme Court described the 1992 Plan's District 12 as "unusually shaped...approximately 160 miles long and, for much of its length, no wider than the [Interstate]–85 corridor. It winds in snake-like fashion through tobacco country, financial centers, and manufacturing areas until it gobbles in enough enclaves of black neighborhoods." 509 U.S. at 635–636, 113 S.Ct. at 2820–2821 (internal quotations omitted). The 1997 Plan's District 12 is similar: it is "unusually shaped," it is "snake-like," and it "gobbles in" African–American population centers. The evidence establishes that although its length has been shortened by approximately 65 miles, it still winds from Charlotte to Greensboro along the Interstate–85 corridor, detouring to envelop heavily African–American portions of cities such as Statesville, Salisbury, and Winston–Salem. It

---

Frank M. Johnson, Jr., *Judicial Activism is a Duty–Not an Intrusion,* VIEWS FROM THE BENCH: THE JUDICIARY AND CONSTITUTIONAL POLITICS 279, 283–4 (1985).

also connects communities not joined in a congressional district, other than in the unconstitutional 1992 Plan, since the whole of Western North Carolina was one district, nearly two hundred years ago.

As discussed above, where cities and counties are split between the Twelfth District and neighboring districts, the splits invariably occur along racial, rather than political, lines—the parts of the divided cities and counties having a higher proportion of African–Americans are always included in the Twelfth. Defendants argue that the Twelfth was drawn not with race, but rather politics and partisanship in mind. They have described the District as a "Democratic island in a Republican sea," and presented expert evidence that political identification was the predominant factor determining the border of District 12. Affidavit of David W. Peterson ("Peterson Aff."). As the uncontroverted evidence demonstrates, however, the legislators excluded many heavily-Democratic precincts from District 12, even when those precincts immediately border the Twelfth and would have established a far more compact district. The only clear thread woven throughout the districting process is that the border of the Twelfth district meanders to include nearly all of the precincts with African–American population proportions of over forty percent which lie between Charlotte and Greensboro, inclusive.

As noted above, objective measures of the compactness of District 12 under the 1997 Plan reveal that it is still the most geographically scattered of North Carolina's congressional districts. When compared to other previously challenged and reconstituted congressional districts in North Carolina, Florida, Georgia, Illinois, and Texas, District 12 does not fare well. The District's dispersion and perimeter compactness indicators (0.109 and 0.041, respectively) are lower than those values for North Carolina's District 1 (0.317 and 0.107 under the 1997 Plan). Similarly, the District suffers in comparison to Florida's District 3 (0.136 and 0.05), Georgia's District 2 (0.541 and 0.411) and District 11 (0.444 and 0.259), Illinois' District 4 (0.193 and 0.026), and Texas District 18 (0.335 and 0.151), District 29 (0.384 and 0.178), and District 30 (0.383 and 0.180).

Additionally, Plaintiffs' expert, Dr. Weber, showed time and again how race trumped party affiliation in the construction of the 12th District and how political explanations utterly failed to explain the composition of the district. (Trial Transcript at 162–3, 204–5, 221, 251, 262, 288). Of particular note is Dr. Weber's contention that a much more compact, solidly Democratic 12th District could have been created had race not predominated over traditional political considerations in the redistricting process. (Trial Transcript at 220–1) Additionally, Dr. Weber showed that, without fail, Democratic districts adjacent to District 12 yielded their minority areas to that district, retaining white Democratic precincts. (Trial Transcript at 255–6). This testimony served to undermine Defendants' contention that race was merely a factor in creating the 1997 Plan's 12th District, and that a desire to place high-performance Democratic areas (which happen to contain minority populations) within Democratic districts could explain the construction of the 12th.

The conclusion that race predominated was further bolstered by Senator Cooper's allusion to a need for "racial and partisan balance," cited above. The senator's contention that although he used the term "partisan balance" to refer to the maintenance of a six-six Democrat–Republican split in the congressional delegation, he did not mean the term "racial balance" to refer to the maintenance of a ten-two balance between whites and African Americans is simply not credible. (Trial Transcript at 429–30)

Dr. Weber, who has testified as an expert in redistricting cases in Louisiana, Texas, Georgia, Virginia and Florida, also presented a convincing critique of the methodology used by Defendants' expert witness, Dr. Peterson. (Trial Transcript

at 145) Dr. Weber characterized Dr. Peterson's boundary segment analysis as non-traditional, creating "erroneous" results by "ignoring the core" of each district in question. (Trial Transcript at 222–4) In summary, Dr. Weber found that Dr. Peterson's analysis and report "has not been appropriately done," and was therefore "unreliable" and not relevant. (Trial Transcript at 232)

Finally, the Cooper–Cohen email, discussed above, clearly demonstrates that the chief architects of the 1997 Plan had evolved a methodology for segregating voters by race, and that they had applied this method to the 12th District. The Cooper–Cohen email refers specifically to the categorization of sections of Greensboro as "Black," and a scheme by which this section was added to the 12th District, creating a need to "take about 60,000" other citizens out. (Exhibit 58) It is also relevant as evidence of the means by which the 1997 Plan's racial gerrymandering could be achieved with scientific precision, as the precise racial composition of another district (the First) is discussed at length, along with plans to "improve" that district by "boost[ing] the minority percentage." (Exhibit 58)

The computer system used by the state has the capacity to identify and apportion voters based on race, and to determine the exact racial make-up of each district. The Cohen–Cooper email reveals that exact racial percentages were used when constructing districts.[8] Given that the Supreme Court struck down the 1992 Plan's 12th District, the clear inference here is that a motive existed to compose a new 12th District with just under a majority minority in order for it not to present a prima facie racial gerrymander. In fact, Senator Cooper argued before the legislature that the *Shaw* test for constitutionality would not be triggered because the 12th District was not a majority minority district. (Trial Transcript at 440–1) But using a computer to achieve a district that is just under 50% minority is no less a predominant use of race than using it to achieve a district that is just over 50% minority.

Based on the extensive direct and circumstantial evidence presented at trial, the Court finds as a matter of fact that the General Assembly, in redistricting, used criteria with respect to the Twelfth District that are facially race driven. It is clear that the Twelfth District was drawn to collect precincts with high racial identification rather than political identification. Additionally, the evidence demonstrates that precincts with higher partisan representation (that is, more heavily Democratic precincts) were bypassed in the drawing of District 12 in favor of precincts with a higher African–American population. The legislature eschewed traditional districting criteria such as contiguity, geographical integrity, community of interest, and compactness in redrawing the District as part of the 1997 Plan. Instead, the General Assembly utilized race as the predominant factor in drawing the District.[9]

This Court finds that, in contrast to the state's claims regarding the 1st District, no evidence of a compelling state interest in utilizing race to create the new 12th District has been presented. Further, even if such an interest did exist, the 12th District is not narrowly tailored and therefore cannot survive the prescribed "strict scrutiny." The 1997 Plan's District 12 is an impermissible and unconstitutional racial gerrymander in violation of the Equal Protection Clause.

8. Senator Cooper claimed that the final percentage composition of District 12 was sheer happenstance. (Trial Transcript at 427–8) The explicit discussion of precise percentages in the email belies this characterization.

9. The Supreme Court has indicated that, when drawing congressional districts, race may not be used as a proxy for political characteristics. *Bush v. Vera,* 517 U.S. 952, 967–68, 116 S.Ct. 1941, 1956, 135 L.Ed.2d 248 (1996).

To remedy these constitutional deficiencies, the North Carolina legislature must redistrict the 1997 Plan in such a way that it avoids the deprivation of the voters' equal protection rights not to be classified on the basis of race. This mandate of the Court leaves the General Assembly free to use other, proper factors in redistricting the 1997 Plan. The legislature may consider traditional districting criteria, such as incumbency considerations, to the extent consistent with curing the constitutional defects. *See Shaw II*, 517 U.S. at 906–07, 116 S.Ct. at 1901 (describing "race-neutral, traditional districting criteria").[10]

### III. First Congressional District

█ The three-judge panel in *Shaw* never ruled on the constitutionality of the 1992 Plan's First Congressional District. Standing problems on the part of the *Shaw* plaintiffs forced that court to narrow its focus to adjudicate only the issues raised regarding the Twelfth District. A comparison of the First and Twelfth Districts under the 1992 Plan reveals, however, that they are similarly egregious in their construction and that the First District would certainly have been subject to the same finding that it was not narrowly tailored. Both were majority-minority districts under the 1992 Plan, and neither evidenced even minimal geographical compactness.

The 1997 Plan's First District, once again presents this Court with a majority-minority district, this time containing a population that is 50.27 percent African–American, as opposed to the Twelfth District's 46.67 percent. The First District is, however, far more compact than the Twelfth and its shape is less irregular, as we have seen above.

This Court finds as a matter of fact that, under the 1992 Plan, the First District was not narrowly tailored and therefore that district was in violation of the Constitution. The evidence presented by the Defendants does not dispute this finding.

The statements of several key players in the 1997 redistricting process clearly show that, in an effort to gain pre-clearance under the Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, they allowed race to predominate in the creation of the 1st District. The Cohen–Cooper email is one such clear example, specifically referencing the desire to "boost the minority percentage in the first district" to create an "improved" district. The email exposes a process in which voters were categorized by race, then shifted in and out of the 1st District by a computer program until a precise percentage of minority voters in the district was achieved. No other credible explanation has been offered.

The fact that race predominated in the construction of the 1st District is not surprising. The legislators faced the difficult task of remedying the unconstitutional aspects of the 1992 Plan's 1st District while complying with the mandates of the Voting Rights Act, discussed below. Indeed, Senator Cooper acknowledged that he felt he had to have over 50% minority representation in the First District. (Trial Transcript at 440) This admission reveals that the racial composition of the district was seen as a mandate, a necessity.

Thus, we further find that, in its 1997 Plan, the State continued to use race as the predominant factor in creating the majority-minority First District, and thus strict scrutiny must apply. This does not end our inquiry, however. Defendants may show that the district was narrowly tailored to achieve a compelling government interest.

---

10. Our distinguished colleague's dissent treats the standing of Plaintiff Linville at some length Defendants moved to dismiss him from the instant suit, arguing that he did not live within the 1997 Plan's 12th District. This motion was denied at trial. Trial Transcript at 327. As there is standing on behalf of a plaintiff or plaintiffs with respect to each of the challenged districts, Plaintiff Linville's standing is moot as to this Court's ability to reach a decision in the instant case. Thus, we decline to elaborate on the standing issue.

■ Section 2 of the Voting Rights Act provides that "no voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, ...." 42 U.S.C. § 1973(a)(1988). Congress instructed the courts, when determining whether a voting standard, practice, or procedure violates this prohibition, to examine "the totality of the circumstances" to ascertain whether "the political processes leading to nomination or election" are equally open to citizens of all races. Id. § 1973(b). Courts may also consider "[t]he extent to which members of a protected class have been elected to office," but the Act expressly states it does not establish "a right to have members of a protected class elected in numbers equal to their proportion in the population." Id.

In *Thornburg v. Gingles*, the Supreme Court first examined the 1982 amendments to the Act. 478 U.S. 30, 34, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). The Court found that the 1982 amendments no longer required a showing of intentional discrimination in order to prove a violation of the Act. *Id.* at 35, 106 S.Ct. at 2758. The Court identified the following "necessary preconditions" to a § 2 claim:

"First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district...

Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67 (footnotes and internal citations omitted). Once these preconditions are met, a court must consider the factors identified in the Senate Report accompanying the 1982 amendments. *Id.* at 48, 106 S.Ct. at 2765.[11]

Defendants presented evidence at trial to show that there was a strong basis for the General Assembly to have believed, at the time of the 1997 Plan's drafting, that the three *Gingles* preconditions and several of the factors set forth in the Senate Report existed in North Carolina. Specifically, the Defendants presented evidence that the African–American population in the area encompassed by District 1 was and is sufficiently large and geographically compact to constitute a majority in a congressional district. Additionally, Defendants contend, and Plaintiffs have stipulated for the purposes of this trial, that the African–American population is politically cohesive. Further, Defendants contend, and Plaintiffs have stipulated for the purposes of this trial, that the white majority votes sufficiently as a block to often enable it to defeat the minority's preferred candidate. Finally, all parties agree that, for

---

**11.** Those factors are: *(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slating process, whether the members of the minority group* have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction. Sen.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206–07. This list of factors, however, "is neither comprehensive nor exclusive." *Gingles,* 478 U.S. at 45, 106 S.Ct. at 2763.

many decades, African–Americans in North Carolina were victims of racial discrimination, and that a substantial majority of the State's African–American population is still at a disadvantage in comparison to white citizens with respect to income, housing, education and health.

This Court finds that Defendants have presented sufficient evidence to establish that the State Legislature of North Carolina did have a compelling reason to address race in the construction of the First District under the 1997 Plan. That compelling reason was the need to satisfy Section 2 of the Voting Rights Act in order to ensure that the State's African–American population have equal access to the political process.

Further, this Court finds that the specific composition of the First District's borders, while predominated by race, was narrowly tailored to meet the Section 2 requirements while also addressing other traditional, political considerations, including the desire to protect incumbency, both of a Democrat in the First District and a Republican in the Third District. The splitting of counties and lack of compactness display the interplay between these considerations: the borders were drawn to avoid putting two incumbents in a single district; the State Legislature intended to exclude as much of the First State Senatorial District from the 1997 Plan's 1st District as possible, resulting in modifications that forced the district's borders south and west. While race predominated, the legislature resisted the temptation to create a district reminiscent of the 1992 Plan's 1st District, which reflected little or no effort to achieve a narrow tailoring.

Thus, this Court finds that the 1997 Plan's 1st District meets the requisite standard of strict scrutiny. Race, while the predominant factor in its composition, was not impermissibly used in establishing its borders. There was a compelling state interest in obtaining pre-clearance under

Section 2 of the Voting Rights Act, and the 1st District was narrowly tailored to meet this interest. Thus we find that the 1997 Plan's 1st District does not present an unconstitutional racial gerrymander.

### CONCLUSION

For the reasons discussed above, this Court finds that the 1997 Plan's Twelfth District continues to be unconstitutional as presented. Defendants are enjoined from using the unconstitutional District 12 in future elections. The 1997 Plan's First District does not violate the Constitution and may thus be used in future elections. Defendants will have an opportunity to correct the constitutional defects in the 1997 Congressional Redistricting Plan stemming from the 12th District, in default of which the Court must undertake the task.

SO ORDERED.

### CONCURRENCE AND DISSENT

THORNBURG, District Judge, sitting by designation as Circuit Judge, concurring in part and dissenting in part.

I join the majority in concluding that the First Congressional district is constitutionally drawn, but respectfully dissent from the reasoning of the majority in reaching that conclusion. I dissent from the majority opinion finding the Twelfth Congressional district to be an unconstitutional racial gerrymander. I also write to address the issue of Ronald Linville's right to remain a party plaintiff in this action.

### I. BACKGROUND

In early 1997, the North Carolina General Assembly, for the third time in the decade, undertook the responsibility of redrawing the boundaries of North Carolina's congressional districts.[12] Operating under a court imposed deadline of April 1997 to redraw congressional district

---

**12.** The General Assembly redrew the districts for the fourth time in 1998 pursuant to this Court's order, and now will be required to do so for the fifth time in early 2000.

boundaries, the politically divided General Assembly faced the task of quickly reaching a consensus on the divisive and inherently political issues involved. In addition to the traditional constituency concerns, the pull of party loyalty, incumbency issues, special interests, and turf protection, the General Assembly was forced to contend with a host of outside forces seeking to influence the process. Looming over the usual morass of political decision-making was the federal court system, a Justice Department which from past experience was willing to withhold preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, and the ever present threat of litigation under Section 2 of the same Act. In addition, able private litigants on both sides of the issue stood ready to sue the State of North Carolina in the event that racial motives controlled the process, or in the event that the process was not racially fair. From this cauldron of conflicting agendas and influences, the majority concludes that *the* predominant motivating factor of the 170 legislators in the General Assembly as they drew the redistricting plans for the First and Twelfth Districts was race. This is a particularly disturbing conclusion under the history, the facts, and the law of this case.

That the General Assembly was not completely paralyzed by the demanding task it faced is a testament to the efforts of the legislators themselves, and particularly to the committee chairmen who crafted a plan that would pass both houses. Central to the General Assembly's motivation was the desire not to forfeit the responsibility of drawing constitutional districts to the federal courts, as had happened in Georgia, Texas, and Illinois. To suggest that the General Assembly could navigate these treacherous waters without being aware of the issue of race would be absurd because race loomed as *the* reason

why the General Assembly had to redraw districts in the first place. But, the 1992 Plan is *not* the plan being considered by this Court. The conclusion that racial motivations impermissibly predominated, in a process where consciousness of race is not prohibited,[13] fails to evaluate Plaintiffs' burden of proof and insufficiently credits the plain and direct testimony of the two state legislators who were the driving force behind the 1997 congressional redistricting plan.

## II. *JUDICIAL DEFERENCE*

The Constitution leaves with the States primary responsibility for apportionment of their federal congressional districts. U.S. Constitution, Article I, § 2, as amended by Amendment XIV § 2. "We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975) (citing *Reynolds v. Sims,* 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)) (other citations omitted). In the matter of redistricting, courts owe substantial deference to the legislature, which is fulfilling "the most vital of local functions" and is entrusted with the "discretion to exercise the political judgment necessary to balance competing interests." *Miller v. Johnson,* 515 U.S. 900, 915, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). The Court must presume the legislature acted in good faith absent a sufficient showing to the contrary. *Id.* Consequently, this Court must grant North Carolina's General Assembly substantial deference concerning its decisions related to the 1997 redistricting plan. In deciding this case we should avoid the temptation to legislate for the

---

**13.** In dealing with an equal protection lawsuit involving mixed motives in the drawing of congressional districts, "strict scrutiny does not apply merely because redistricting is performed with consciousness of race." *Bush v.* *Vera,* 517 U.S. 952, 958, 116 S.Ct. 1941, 135 L.Ed.2d 248 (citing *Shaw v. Reno,* 509 U.S. 630, 646, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (Shaw I)).

General Assembly. *Id.* Under the facts of this case and the Supreme Court's decisions, judicial activism is neither necessary nor desirable. The majority would mask its unwarranted intrusion into the North Carolina legislative process by correctly observing the duty of a federal court to "uphold the Constitution and laws of the United States." Majority Opinion, at 417–18, n. 7. They ignore, however, Judge Johnson's qualifying words: "[It is] when governmental institutions *fail* to make ... judgments and decisions in a manner which comports with the constitution [that] federal courts have a duty to remedy the violation." *Id.* Thus, while espousing judicial restraint, the majority will again declare the Twelfth District unconstitutional and return the districting plan to the General Assembly for correction. This approach ignores the principles of federalism which require federal courts to exercise deference and restraint in altering the state redistricting decision in the first place.

### III. *STANDARD OF REVIEW*

Strict scrutiny should not be applied to the decision of North Carolina's General Assembly merely because redistricting was performed with consciousness of race. *See* n. 1, *supra.* As previously observed, the Voting Rights Act dictates that race may not be ignored. *See e.g., Johnson v. De Grandy,* 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); *Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994); *Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). For strict scrutiny to apply, the burden is on the Plaintiffs to show that "other, legitimate districting principles were 'subordinated' to race," i.e., that race was *"the predominant* factor motivating the legislature's [redistricting] decision." *Bush,* 517 U.S. at 959, 116 S.Ct. 1941 (citing *Miller,* 515 U.S. at 916, 115 S.Ct. 2475) (emphasis added). Plaintiffs may meet this burden through either "circumstantial evidence of a district's shape and demographics" or through "more direct evidence going to

legislative purpose." *Miller,* 515 U.S. at 916, 115 S.Ct. 2475. In *Miller,* the Supreme Court recognized certain factors as legitimate districting principles, "including, but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests." *Id.* Incumbency protection, at least in the limited form of "avoiding contests between incumbent[s]," has also been recognized as a legitimate state goal. *Bush,* at 964, 116 S.Ct. 1941 (citations omitted). Likewise, the Supreme Court has repeatedly held that states "may engage in constitutional political gerrymandering, *even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State is conscious of that fact." Hunt v. Cromartie,* 526 U.S. 541, 551, 119 S.Ct. 1545, 1551, 143 L.Ed.2d 731 (1999) (emphasis added).

> Evidence that blacks constitute even a supermajority in one congressional district while amounting to less than a plurality in a neighboring district will not, by itself, suffice to prove that a jurisdiction was motivated by race in drawing its district lines when the evidence also shows a high correlation between race and party preference.

*Id.* Only where race *predominates* over legitimate districting principles will strict scrutiny apply to a State's redistricting decision.

The burden of proving that racial motives predominated over legitimate districting principles is not easily met. This difficulty is due in part to the inherent nature of any legislative decision where numerous motives and influences are at work. Concurring in the *Miller* decision, Justice O'Connor further clarified the rigorous nature of the Plaintiffs' burden:

> I understand the threshold standard the Court adopts ... to be a demanding one. To invoke strict scrutiny, a plaintiff must show that the State has relied on race in *substantial disregard* of customary and traditional districting prac-

tices .... [A]pplication of the Court's standard helps achieve *Shaw's* basic objective of making *extreme instances* of gerrymandering subject to meaningful judicial review.

*Miller*, 515 U.S. at 928–29, 115 S.Ct. 2475 (emphasis added). *See also, Quilter v. Voinovich*, 981 F.Supp. 1032, 1044 (N.D.Ohio 1997) ("We therefore follow Justice O'Connor's lead in applying a demanding threshold that allows states some degree of latitude to consider race in drawing districts."), *aff'd*, 523 U.S. 1043, 118 S.Ct. 1358, 140 L.Ed.2d 508 (1998). As a result of this high threshold, a State which does no more than take race into consideration in the redistricting process will not be subjected to strict scrutiny. *Bush*, 517 U.S. at 958, 116 S.Ct. 1941. Even a State's decision to intentionally create a minority-majority district will not necessarily be subject to strict scrutiny. *Id.*

In applying this high threshold standard to the case at hand, it is this Court's responsibility to closely examine all of the evidence to determine whether by a preponderance of the evidence the North Carolina General Assembly substantially disregarded legitimate districting principles, including incumbency protection and political motivations, and subordinated those principles to race in the districting process. Only then can strict scrutiny be applied to the decision of the state legislature. Furthermore, each challenged district must be evaluated separately to determine whether strict scrutiny will apply to that district. In situations where "it is clear that race was not the only factor that motivated the legislature to draw irregular district lines," each challenged district must be scrutinized individually to determine whether the legislature relied on race in substantial disregard of legitimate districting principles. *Bush*, 517 U.S. at 965, 116 S.Ct. 1941. The legislature's motivation as to one district cannot be transferred to another.

## IV. DISCUSSION

Initially, I note that the 1997 plan must be addressed based on its own merit, not on any resemblance to the 1992 Plan. The majority opinion appears to have recognized this rule of law in noting that the Court's role is limited to determining "whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights-that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place." *McGhee v. Granville County, N.C.*, 860 F.2d 110, 115 (4th Cir.1988) (citing *Upham v. Seamon*, 456 U.S. 37, 42, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982)). Nevertheless, the majority makes reference to the "unconstitutional" 1992 Plan in criticizing both the First and Twelfth Districts under the 1997 Plan. This criticism essentially mirrors the "footprint" argument advanced by Plaintiffs, and therefore is equally flawed.

Plaintiffs contend that any district which is based on the "footprint" of a prior unconstitutional district is inherently invalid. This suggests that the legislature *must* begin with a completely clean slate in order to wipe away the vestiges of prior unconstitutional districts. Thus, the North Carolina General Assembly could not use the unconstitutional 1992 Plan as the beginning point for creating the 1997 Plan. However, given that the task of the General Assembly in 1997 was to *correct* the defects of the 1992 plan, it should be permissible to use the 1992 Plan as the starting point for creating a constitutional plan. Further, it would be illogical to argue that the unconstitutional aspects of a decision made by legislators in 1992 somehow taints the actions of a completely different legislative body in 1997. Most importantly, requiring a legislature to start completely from scratch makes their task nearly impossible because congressional incumbents and state legislators will invariably demand the preservation of as much of the geographic core of districts as possible, a political reality explained in testimo-

ny at the trial.[14] Indeed, the undersigned can think of no reason why a legislature may not simply address the offensive aspects of an unconstitutional district, cure those defects, and thereby create a constitutional district.

## A. The Twelfth Congressional District

To show that racial motives predominated in the drawing of the Twelfth District, Plaintiffs had the burden of proving by a preponderance of the evidence that the legislature substantially disregarded legitimate districting criteria and subordinated those criteria to the improper racial motivation. A thorough treatment of Plaintiffs' burden is noticeably absent from the majority opinion, but this burden must not be overlooked or disregarded. Plaintiffs quite simply have failed to carry their burden through either direct or circumstantial evidence.[15] Defendants, on the other hand, have produced ample and convincing evidence which demonstrates that political concerns such as existing constituents, incumbency, voter performance, commonality of interests, and contiguity, not racial motivations, dominated the process surrounding the creation and adoption of the 1997 redistricting plan.

Finding that race was the predominant motivation and applying strict scrutiny to the Twelfth District fails to evaluate the redistricting process within the context of the legislative environment where such decisions occur.

Passing a redistricting plan in a limited time period, under a federal court order, and in a politically divided General Assembly seemed like an impossible task early in 1997. Trial Transcript, at 475, lines 5–12. In order to succeed, the chairmen of the House and Senate Redistricting Committees recognized the necessity of creating a plan which would garner the support of both parties and both houses. *Id.*, at 335, lines 4–10; at 338, lines 19–22. Consequently, they set out to design a plan which, in addition to addressing the constitutional deficiencies of past plans, would protect incumbents and thereby maintain the then existing 6–6 partisan split amongst North Carolina's congressional delegation. *Id.*, at 475, lines 13–23; at 338, lines 1–7. Because both the First and Twelfth Districts had Democrat incumbents, and maintaining the 6–6 split was viewed as imperative, preserving a strong Democratic Twelfth District which protected incumbent Mel Watts' political base was absolutely necessary. Affidavit of Roy A. Cooper, III, filed March 2, 1998, at ¶ 10. In creating such a district, common sense as well as political experience dictated ascertaining the strongest voter-performing Democratic precincts in the urban Piedmont Crescent. That many of those strong Democratic performing precincts were majority African–American, and that the General Assembly leaders were aware of that fact, is not a constitutional violation.[16] Those precincts were included in

---

**14.** Indeed, Senator Roy Cooper, chairman of the Senate Redistricting Committee testified at trial that he did not think the General Assembly *could* have drawn a plan from square one which would have passed because state legislators and congressional incumbents both wanted districts which preserved as much of their geographic cores as possible. Trial Transcript, at 350, lines 12–25. Likewise, Plaintiffs' own expert agreed that legislatures generally try to avoid disrupting the relationship between incumbents and their voters, testifying that "whatever districts [incumbents] end up with, they tend to, in the end, like and wish to preserve as long as they can. That's been an observation over decades

and decades of study of redistricting." *Id.*, at 279–80.

**15.** Plaintiffs conducted their case as if they were entitled to a presumption that race predominated and merely had to rebut Defendants' efforts to overcome this presumption. However, Plaintiffs are entitled to no such presumption, not by their past success in this area or previous success in this case at the summary judgment stage. The burden of proof lies squarely on the shoulders of Plaintiffs, and they have failed to adequately carry that burden.

**16.** All parties agree that African–American voters in North Carolina are extremely loyal

the Twelfth District based primarily upon their Democratic performance, not their racial makeup.[17] North Carolina's legislative leaders have openly admitted to being aware of the race issue, to being conscious of the racial percentages of the districts they drew, and to recognizing that their redistricting plan could potentially be subjected to federal scrutiny yet again as a challenged racial gerrymander.[18] Yet, these were merely some of the numerous political considerations which legislative leaders had to account for in designing a plan which would pass.

The expert testimony of Dr. David W. Peterson, the unbiased statistician whose opinions were referenced by the Supreme Court in *Hunt v. Cromartie*, supports Defendants' position. Dr. Peterson opined that, based purely on the Plaintiffs' circumstantial statistical evidence, politics was *at least as* plausible a motivating factor as race in the drawing of the Twelfth District. Trial Transcript, at 486–88. In other words, the statistical evidence before

the Court does not support the proposition that race *predominated* as a motivation. Yet, it is this same equivocal statistical evidence which forms the backbone of the Plaintiffs' case.

In an attempt to rebut this argument, Plaintiffs relied primarily on the testimony of their expert witness, Dr. Ronald Weber.[19] Dr. Weber also plays a prominent role in the majority opinion. Dr. Weber argued that the North Carolina legislature failed to include numerous precincts in the Twelfth District which had high levels of Democratic support, but which were not majority African–American. Consequently, he contended the legislature must have been more focused on race than on creating a Democratic district. Dr. Weber also criticized Dr. Peterson's findings as "unreliable" and not relevant. Trial Transcript, at 232, lines 1–8. However, it is the testimony of Dr. Weber, who admitted his belief that legislative bodies should not ·be trusted to draw district lines, which the

Democratic voters, with over 95% of African–American voters in North Carolina registered and voting accordingly. Trial Transcript, at 388, lines 2–7.

17. The fact that the majority of African–American legislators in the North Carolina House of Representatives voted *against* the enactment of the 1997 redistricting plan, Trial Transcript, at 478, lines 3–13, tends to undermine the conclusion that the legislature designed districts which impermissibly favored African–Americans.

18. The majority points to the Cooper–Cohen e-mail as evidence of a "methodology for segregating votes by race." Majority Opinion, at 420. The majority also suggests that sinister inferences arise from Senator Cooper's statements on the legislature floor that the *Shaw* test for constitutionality might not be triggered since the Twelfth District was below 50% African–American. However, this anecdotal evidence does little more than reinforce what is already known, and what is not constitutionally impermissible: North Carolina's legislative leaders were conscious of race, aware of racial percentages, on notice of the potential constitutional implications of their actions, and generally very concerned with these and every other political and partisan

consideration which affected whether or not the redistricting plan would pass. Although it is indeed helpful and important to examine facts such as these which arguably support Plaintiffs' position, they must be evaluated within the context of Plaintiffs' heavy burden in this case, something the majority fails to do. When viewed in proper context, these evidentiary revelations contribute little to Plaintiffs' efforts to show that racial motives *predominated*. And they certainly do not amount to the "smoking gun" status which Plaintiffs would have the Court believe.

19. Plaintiffs also provided the testimony of witnesses who were, at best, peripheral players in the General Assembly's decision-making process. Three of those witnesses were not members of the General Assembly when the plan in question was adopted and indicated no direct involvement with that process. Trial Transcript, at 89, lines 2–7 (R.O. Everette); at 104, 105, lines 1–18 (J.H. Froelich, Jr.); at 113, lines 12–19 (Neil Williams). Of the three witnesses who were members of the General Assembly during the relevant time period, none claimed to have had a significant involvement with or specific knowledge of the decision-making process. Nevertheless, each confidently expressed the opinion that racial motivations did predominate as to the Twelfth District.

undersigned finds lacking in credibility. *Id.*, at 281, lines 3–14; *United States v. Turner*, 198 F.3d 425, 429 n. 2 (4th Cir. 1999) (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) ("The partiality of a witness is always relevant as discrediting the witness and affecting the weight of this testimony.")). This stated bias is evident throughout his testimony and undermines both his criticism of Dr. Peterson as well as his assertion that political explanations fail to explain the composition of the Twelfth District. His "hired gun" mentality and obvious prejudice against legislatures fulfilling "the most vital of local functions," attest to the unreliability of his conclusions.[20] *Miller*, 515 U.S. at 915, 115 S.Ct. 2475.

Overlooking Dr. Weber's lack of credibility, his arguments still do little to advance Plaintiffs' position. First, there is no dispute that every one of the majority African–American precincts included in the Twelfth District are among the highest, if not the highest, Democratic performing districts in that geographic region. Thus, although Dr. Weber pointed to other precincts which he suggests are highly Democratic in performance, this does not explain why any of the *highest* performing Democratic precincts should be excluded from the Twelfth District. Furthermore, Dr. Weber's entire line of criticism ignored geographic realities and one-person, one-vote principles. Weber admitted that the precincts which he argued are strongly Democratic were chosen without considering where they were located.[21] Trial Transcript, at 286–88. Further, under one-person, one-vote principles, Weber's precincts could not all possibly be included in the Twelfth District without removing a corresponding number of voters from elsewhere in the district.[22] *Id.* Finally, Weber's analysis is flawed due to the incorrect assumptions under which he conducted his study. Weber admitted he considered no hypothesis other than race as the legislature's predominant motive, and he specifically failed to inquire about real world political or partisan factors which might have influenced the process. *Id.*, at 258, lines 2–11. One reason for the focus on race was Dr. Weber's incorrect belief that the person drawing North Carolina's districts could only see racial data, when in fact North Carolina's computer screens displayed information on political breakdowns of both voter registration and voter performance.[23] *Id.*, at 261, lines 4–8. This error, his failure to account for other potential factors, the flaws in his arguments, and his ingrained personal bias combine to undermine his subsequent conclusions and criticisms. In the end, the undersigned sees no reason to give any weight to the

**20.** As the majority notes, Dr. Weber has testified in over 30 racial gerrymandering cases. Exhibit 49. In the dissent in *Johnson v. Mortham*, 926 F.Supp. 1460 (N.D.Fla.1996), Circuit Judge Hatchett criticized Dr. Weber's testimony as lacking credibility because Weber had previously testified in support of the "Margolis plan" in 1992, but now purported to testify against the subsequent plan which he admitted was practically identical. *Id.*, at 1505 n. 11, 1513.

**21.** On cross-examination, the Defendants presented maps which showed that few highly performing Democratic precincts actually abutted the Twelfth District. Exhibits 140–142; Trial Transcript, at 290–292; at 294, lines 20–25. Consequently, few of the strong Democratic precincts to which Dr. Weber referred could have easily been included in the Twelfth District.

**22.** The undersigned notes here that just because North Carolina was able to draw a more compact Twelfth District in 1998 which still performed for the Democrats does not mean that the 1997 Twelfth District was necessarily unconstitutional.

**23.**

    Q. Isn't it true that you only considered race because you believed the North Carolina computer system only displayed racial breakdowns and did not display political breakdowns?

    A. At that time I had not seen the screens for North Carolina. I had seen the screens in Louisiana. And in Louisiana, they did not prominently display political information on the screen.

Trial Transcript, at 259, lines 16–23.

opinions of Dr. Ronald Weber and fails to understand the majority reliance on such a thin reed.

Another significant shortcoming of the majority's analysis is the failure to adequately credit the testimony of the two men who were the driving force behind the creation of the 1997 Redistricting Plan. Senator Roy Cooper, III, served as the Democrat chair of the Senate Redistricting Committee and Representative Edward McMahan acted as the Republican chair of the House Redistricting Committee. They were responsible for developing a redistricting plan that could pass both houses and for marshaling it through the legislative process. They indicated that the 1997 plan and the formulation of its boundaries came primarily from their personal negotiations with each other. *Id.*, at 463, lines 3–5. Both testified that correcting the constitutional defects of the previous plan and passage of the bill by ensuring a 6–6 partisan split were the two central goals in developing the 1997 plan. Trial Transcript, at 334; at 475, lines 13–25. Indeed, each testified under oath that politics, not race, was the predominant motivating factor in the Plan's development, with Senator Cooper going so far as to call partisan fairness an "overriding factor." *Id.*, at 337, lines 7–10. This Court's finding that racial motives predominated in the legislative process directly contradicts their express testimony.

In contrast to Plaintiffs, the Defendants adequately supported their position with convincing evidence, even though they had no burden of proof in this trial. Senator Cooper and Representative McMahan detailed the motivations behind their actions, at times expressing regret for having to expose the naked political nature of their conduct. *Id.*, at 423, lines 4–12. In addition to incumbency protection, other factors considered by the General Assembly included increasing geographic compactness and reducing the number of split counties and precincts. *Id.*, at 349, lines 16–25; at 475, lines 13–25. The 1997 Twelfth District as adopted reflected the legislators' focus on these legitimate districting criteria. The 1997 Twelfth District is more compact, splits fewer counties and precincts, and is much more pleasing to the eye than the previous District. *Id.*, at 334, lines 7–15. The General Assembly shortened the District from 191 to 102 miles, moved 60 percent of the geographic area and 30 percent of the population out of the District,[24] and eliminated the long narrow corridors and other objectionable characteristics which had previously been criticized. *Id.*, at 349, lines 16–23. Most importantly, the Twelfth District is not a minority-majority district by any traditional measurement, numbering 46.67 percent African–American in total population and only 43.36 percent African–American in voting age population. Final Pre–Trial Order, at ¶ 26.

Furthermore, the General Assembly had before it abundant evidence of a clear community of interest in the Twelfth District.[25] The three urban areas located along the Interstate–85 industrial corridor, known as the Piedmont Crescent, share common characteristics and face similar problems. North Carolina's Section 5 Submission, 1997 Congressional Redistricting Plan, 97C–28F–3B, Tab 10. One statement submitted at a public hearing described the Twelfth District as "uniquely urban in its dominant issues," some of which were described as affordable housing, alternative transportation, air and water quality, and various other complex issues found in an increasingly populated and urban area.

---

**24.** Final Pre–Trial Order, filed November 29, 1999, at ¶'s 36–37. This included moving 4 out of 10 counties into other districts. *Id.*, at ¶ 30.

**25.** Substantial evidence from both private citizens and politicians concerning the benefits of having a Piedmont Crescent district was submitted at the public hearings and therefore was before the legislature. North Carolina's Section 5 Submission, 1997 Congressional Redistricting Plan, Volume IV.

*Id.*, at Tab 11, at ¶ 8–9. As a consequence, the urban voters in the Twelfth District as presently configured have much more in common with each other than with rural voters living on the distant outskirts of those urban cities.[26] *Id.* Senator. Cooper felt that maintaining this community of interest was one of the legislature's motivating factors, and indeed, the 1997 Twelfth District as drawn reflected and protected the clear community of interest in the Piedmont Crescent. Affidavit of Senator Roy A. Cooper III, at ¶ 9.

The evidence presented by Defendants demonstrates that politics predominated in the drawing of the Twelfth District in 1997. Plaintiffs evidence does nothing more than address the admitted fact that legislative leaders were aware of the race issue, or perhaps that the Twelfth District could have possibly been drawn in a different way to accomplish the legislature's stated political goals. Such evidence does not meet Plaintiffs' heavy burden of showing by a preponderance of the evidence that racial motives predominated in substantial disregard of legitimate districting criteria.

In some circumstances, incumbency protection might explain as well as, or better than, race a State's decision to depart from other traditional districting principles, such as compactness, in the drawing of bizarre district lines. And the fact that, "[a]s it happens, ... many of the voters being fought over [by the neighboring Democratic incumbents] were African–American," would not, in and of itself, convert a political gerrymander into a racial gerrymander, no matter how conscious redistricters were of the correlation between race and party affiliation. See *Shaw I*, 509 U.S. at 646, 113 S.Ct. at 2826. If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify, just as racial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commission of that crime.

If the State's goal is otherwise constitutional political gerrymandering, it is free to use the kind of political data on which Justice Stevens focuses—precinct general election voting patterns, precinct primary voting patterns, and legislators' experience—to achieve that goal regardless of its awareness of its racial implications and regardless of the fact that it does so in the context of a majority-minority district. To the extent that the District Court suggested to the contrary, it erred.

*Bush*, 517 U.S. at 967–68, 116 S.Ct. 1941 (citations omitted). Only to the extent race is used as a proxy for political characteristics will strict scrutiny be applied to otherwise permissible political gerrymandering. *Id.* Therefore, I conclude that strict scrutiny should not be applied to the Twelfth District.

**B. The First Congressional District**

The First District in the 1997 Plan is 50.27 percent African–American in total population and 46.54 percent African–American in voting age population. Final Pre-Trial Order, at ¶ 27. Thus, the First District is the only majority-minority district in North Carolina in terms of total population, and no congressional district in this state is majority-minority in terms of voting age population. However, this fact does not change the applicable legal standard. A State's decision to intentionally create a majority-minority district is not necessarily subject to strict scrutiny.

---

**26.** The majority observes that Charlotte, Winston–Salem, and Greensboro have never before been joined in a congressional district prior to 1992. However, it is irrelevant that the impetus for first grouping these metropolitan areas together was a plan since declared unconstitutional. See discussion, supra p. 411–12. What currently is relevant is the clear community of interest in this Piedmont Crescent district which has been recognized by politicians and private citizens alike.

*Bush,* 517 U.S. at 958, 116 S.Ct. 1941. Plaintiffs still have the burden of showing by a preponderance of the evidence that race was the predominant factor motivating the legislature's decision and that legitimate districting criteria were subordinated to race. *Miller,* 515 U.S. at 916, 115 S.Ct. 2475.

Senator Cooper and Representative McMahan testified that they were motivated to create a majority-minority district in the Northeastern area of the state to avoid concerns under the Voting Rights Act. Trial Transcript, at 365, lines 10–25; at 464, lines 5–8. However, their motivation was predicated on the knowledge that they could create a compact, contiguous district in Northeastern North Carolina which focused on an undeniable community of interests.

> [A]s we went through the process it became clear that we could draw a nice, compact district that made geographic sense, that put together communities of interest, that was a strongly leaning Democratic district, that was slightly majority-minority population.

*Id.,* at 359, lines 18–23.

> District 1 is a largely agrarian rural district. It has a lot of medium sized towns. I think uniquely [in] Eastern North Carolina you have the 30 to 50,000 population towns with largely rural areas. A lot of these counties are largely poorer counties, they are very high up on our economic tiers of depressed counties. So I think that there's a great community of interest in

Northeastern North Carolina with those counties that are up there.

*Id.,* at 368, lines 8–15.

Likewise, Senator Cooper and Representative McMahan were concerned with creating a geographically compact district. McMahan in particular focused almost exclusively on geographical considerations and "making the district look good." *Id.,* at 467, lines 22–25. And indeed, the 1997 redistricting process resulted in a fairly compact and normal looking congressional district in Northeastern North Carolina. The perimeter and dispersion compactness indicators of the First District are not much lower than the mean compactness indicators for North Carolina's twelve districts.[27] Neither number is low enough to raise a "red flag" according to the criteria set out in the Pildes and Niemi study.[28] Furthermore, as the majority correctly observes, where the borders of the First District have significant irregularities, those irregularities are attributable to political motivations, namely the desire to protect incumbents and avoid putting two congressional incumbents in a single district. Majority Opinion, at 423. Therefore, although it was the intent of Senator Cooper and Representative McMahan to create a minority-majority district in Northeastern North Carolina, this decision was based on legitimate districting principles. Quite simply, once they knew they *could* create a compact, contiguous district which addressed the community of interests in Northeastern North Carolina, they felt they *should* do so. Trial Transcript, at 365, lines 17–24.

The majority reaches a different conclusion, however, and applies strict scrutiny to the First District.[29] The majority char-

27. The First District has a dispersion compactness indicator of 0.317 and a perimeter compactness indicator of 0.107. Gerald R. Webster, "An Evaluation of North Carolina's 1998 Congressional Districts," Table 3; Defendants' Exhibits 421–22. The mean numbers for North Carolina's twelve congressional districts are .354 and .192 respectively. *Id.*

28. That study suggested that a "red flag" should be raised when a perimeter compactness indicator is below .05 and a dispersion

compactness indicator is below .15. Webster, at 13 (citing Pieldes & Niemi, Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election–District Appearances After Shaw v. Reno, 92 Mich.L.Rev. 483, 571–573, Table 6 (1993)); Plaintiffs' Exhibit 217.

29. After applying a strict scrutiny standard, the majority concludes that the First District is not an unconstitutional racial gerrymander, finding a compelling state interest under § 2

acterizes the racial composition of the First District as "a mandate, a necessity," and therefore concludes that racial motives predominated. Majority Opinion, at 420. In support of this conclusion, the majority cites the Cooper–Cohen e-mail which refers to the desire to "boost the minority percentage in the first district" to create an "improved" district. Also, the majority points to Senator Cooper's acknowledgment at trial that he felt the need to have over 50 percent minority representation in the First District. Based upon these statements, the majority concludes that the General Assembly "continued to use race as the predominant factor in creating the majority-minority First District, and thus strict scrutiny must apply."[30] *Id.*, at 27.

However, these statements merely highlight the admitted and permissible reality: the North Carolina General Assembly intentionally created a majority-minority district (in terms of population only) in Northeastern North Carolina. But despite the intent to create a majority-minority district, the evidence does not show that racial motives *predominated* in substantial disregard of legitimate criteria like compactness, contiguity, and communities of interest. Trial Transcript, at 365, lines 10–25. On the contrary, the direct testimony shows that the legislature addressed traditional, legitimate districting criteria and determined that a majority-minority district in Northeastern North Carolina was appropriate. Indeed, the criteria of communities of interest and geographical

compactness were uppermost in the legislators' minds. Considering the evidence before the Court in light of the deference due the state legislative decision, my understanding of the applicable legal standard forces me to conclude that race did not impermissibly predominate in the districting process and therefore strict scrutiny should not apply to the First Congressional District.

## V. *REMEDY*

I also respectfully dissent from the decision to require the General Assembly once again to redraw the Twelfth District.

The filing period for Congressional candidates began on January 3, 2000, and ended on February 7, 2000. N.C. Gen. Stat. § 163–106(c). The General Assembly is not scheduled to reconvene until May 2000, the same month that North Carolina will conduct its primary elections. Forcing the General Assembly to call a special session to address this Court's ruling creates a plethora of problems. Ongoing election preparation will be interrupted as congressional candidates will be forced to refile and redesign their election strategies. Citizen confidence in the electoral process will be undermined by the repeated reconfiguration of election districts. While cost is not a factor to be considered in tailoring a constitutional remedy, it will be a concern to citizens hoping for closure in this long-running litigation. Also of no small concern is the time necessary for § 5 pre-clearance of changes from the '97

of the Voting Rights Act and narrowly tailored means. Although I strongly feel that the evidence before the Court does not warrant the application of strict scrutiny, I agree with the majority's analysis concerning the application of the *Gingles* factors to the First District.

**30.** The majority purports to find that "under the 1992 plan, the First District was not narrowly tailored and therefore that district was in violation of the Constitution." Majority Opinion, at 420. However, this Court has no authority to find that the First District under the 1992 Plan was unconstitutional. Due to a standing issue, the Supreme Court in *Shaw II*

did not make a ruling on that district. *Shaw v. Hunt*, 517 U.S. 899, 904, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). Neither this Court nor any court has made a legal ruling on the constitutionality of the 1992 First District. *Cromartie v. Hunt*, 4:96–CV–104–BO(3), Order filed June 21, 1998, at 2. The 1992 Plan no longer exists, is not currently being challenged by Plaintiffs in this case, and simply is not an issue before this Court. To the extent the majority's application of the strict scrutiny is predicated on a comparison to the 1992 First District, such reliance is patently wrong. See discussion *supra*, at 411–12.

or '98 plans, the probability of litigation under § 2 of the Voting Rights Act in the event of major changes in district lines, and the virtual certainty of another challenge by Plaintiffs if the new lines do not meet their satisfaction. To suggest that new districts, hastily drawn pursuant to this Court's Order, could have a salutary effect on the 2001 decennial redistricting is purely speculative in view of the major change anticipated in the North Carolina population since 1990. In short, requiring the North Carolina General Assembly to redraw congressional district lines for the year 2000 election, based as they must be on 1990 census figures, is unjustified, unnecessary and, quite probably, an abuse of discretion.

There is Supreme Court precedent for this Court to consider "the proximity of a forthcoming election and the mechanics and complexities of state election laws" in fashioning appropriate remedies for constitutional violations in redistricting cases. *Reynolds*, 377 U.S. at 585, 84 S.Ct. 1362. There is also Supreme Court precedent for allowing an election to proceed under an unconstitutional plan where an election is impending. *Ely v. Klahr*, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971).

> [A]s we have often noted, districting and apportionment are legislative tasks in the first instance, and the court did not err in giving the legislature a reasonable time to act based on the 1970 census figures which the court thought would be available in the summer of 1971.... [T]he District Court should [then] make very sure that the 1972 elections are held under a constitutionally adequate [redistricting] plan.

*Id.* at 114–15, 91 S.Ct. 1803 (footnote omitted).

> [O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Reynolds, supra;* Order, *supra,* at 14–15 (Ervin, J., dissenting). Further, there is precedent in North Carolina for conducting elections under an unconstitutional plan in order to avoid undue disruption of the electoral process.[31] Permitting the

---

31. In *Shaw v. Hunt*, 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (*Shaw II*), the Supreme Court found that the Twelfth District, as drawn under the 1992 redistricting plan, was unconstitutional. On remand, the three-judge panel determined that the 1996 general elections would continue under the unconstitutional plan.

> [I]n exercise of this Court's equitable power to withhold the grant of immediately effective relief for found constitutional violations in legislative districting plans in order to

avoid undue disruption of ongoing state electoral processes, the 1996 primary elections already held for congressional offices are hereby validated and the 1996 general election for those offices may proceed as scheduled under state law to elect members of congress under the existing districting plan.

Order, filed July 30, 1996 in *Shaw v. Hunt,* 92–202–CIV–5–BR at 2–3 (citing *Reynolds,* 377 U.S. at 585, 84 S.Ct. 1362).

legislature to expend its energy, best judgment, and resources on planning for and developing a constitutional plan for the Twelfth District based on the Year 2000 population data would accord with Supreme Court precedent, accommodate the "equitable considerations" recognized in *Reynolds,* and allow the filings, campaigns and elections for 2000 to proceed on schedule. This Court should keep in mind that whatever the decision is in this case, simple arithmetic and Constitutional mandate dictate the redrawing of at least some new congressional district lines for the year 2002 elections based on the year 2000 census figures.

## VI. *STANDING*

Defendants contest Plaintiff Ronald Linville's standing to participate in this case. As Plaintiffs stipulate, Linville is not a current resident of the First or Twelfth Congressional Districts, the two districts being challenged as racial gerrymanders.[32] Final Pre–Trial Order, filed November 29 1999, at ¶'s 20–23. Although he does not claim to be unhappy with his own district, Linville gives numerous objections to the Twelfth District and concludes that it is drawn along racial lines. Linville Draft Deposition, at 17, 20, 23, 25–26, 34, 56, 57, 65, 75–77. Linville further complains about being separated from his father politically, being implicitly told he was "too white to belong in the district right next to [him]," and being "deliberately segregated immediately outside of a racially drawn district whose boundary was adjacent to his own precinct." Plaintiffs' Response to Defendants' Motion for Summary Judgment, at 22, n. 11. Plaintiffs produced no further evidence which suggests that Linville has been personally injured by a racial classification, despite assurances at the beginning of the trial that they would do so. Trial Transcript, at 5, lines 10–12.

Federal courts have an independent obligation to examine their own jurisdiction; standing "is perhaps the most important of [the jurisdictional] doctrines." *United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (quoting *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)). The party who seeks the exercise of jurisdiction has the burden of clearly alleging facts which demonstrate that he or she is a proper party to invoke judicial resolution of the dispute. *Hays,* 515 U.S. at 743, 115 S.Ct. 2431. Even where a case has proceeded to final judgment after a trial, "those facts (if controverted) must be 'supported adequately by the evidence adduced at trial' to avoid dismissal on standing grounds." *Id.* (citations omitted).

In the context of redistricting cases, a citizen has standing to challenge a racial classification in federal court if that citizen is "able to demonstrate that he or she, *personally,* has been injured by that kind of racial classification." *Id.,* at 744, 115 S.Ct. 2431. Because of the difficulty in demonstrating this individualized harm, the Supreme Court created a presumption in favor of standing for *residents* of a challenged district. *Hays,* 515 U.S. at 744–45, 115 S.Ct. 2431; accord *Miller v. Johnson,* 515 U.S. 900, 910–11, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). However, where a plaintiff is not a resident of the challenged district, the plaintiff is not afforded the benefit of this presumption.

> [W]here a plaintiff does not live in such a district, he or she does not suffer those special harms, and *any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference.* Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.

---

**32.** Although Linville was a resident of the Twelfth District under the 1992 Plan, under the 1997 Plan he is a resident and registered voter of the adjoining Fifth District. His precinct is 95.94 percent white. *Id.*

*Hays,* 515 U.S. at 745, 115 S.Ct. 2431 (emphasis added). The Supreme Court repeatedly has refused to recognize a "generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *Id.,* at 743, 115 S.Ct. 2431 (citations omitted). Consequently, plaintiffs who are not residents of a challenged district may sue only if they are able to make a specific evidentiary showing that they have been "personally classified by race." *Id.,* at 745, 115 S.Ct. 2431; *Shaw II,* 517 U.S. at 904, 116 S.Ct. 1894; *Bush,* 517 U.S. at 957–58, 116 S.Ct. 1941.

By seeking to include Linville as a participant in this lawsuit, Plaintiffs ask this Court to grant standing to a class of plaintiffs which the Supreme Court has explicitly refused to recognize. Only where a non-resident plaintiff is able to make a specific evidentiary showing of personal injury will that plaintiff have standing to sue in federal court. · Linville's litany of generalized grievances will not suffice to create standing. Because Linville is not a resident of the First or Twelfth Districts, and *no* specific evidence that he has personally been subjected to a racial classification is before this Court, I would dismiss Linville as a plaintiff for lack of standing.

## VII. *CONCLUSION*

Lost amidst the smoking gun e-mails, the "uncontroverted" statistical information, and the indignant examinations of irregular district lines is Plaintiffs' burden of proof in this case. The Plaintiffs must demonstrate by a preponderance of the evidence that a racial motivation predominated in the legislature's decision-making and that legitimate districting principles were subordinated to those racial motivations. The Supreme Court's remand in this case affords no relief from the responsibility of meeting this burden. Merely showing that race was an issue, that it was always considered, or that it had an influence on the ultimate outcome is not sufficient.

The two men most knowledgeable about the 1997 Congressional redistricting plan testified before this Court that political, not racial, motivations were the predominant factor in the General Assembly's decision-making process. Their direct testimony, even when confronted with the evidence relied on by the majority, proves that racial motivations did not predominate. Therefore, strict scrutiny should not be applied to the General Assembly's 1997 decision.

Finally, I am compelled to note that this decision forces the North Carolina General Assembly to create a redistricting plan based on population figures from the 1990 census, numbers which everyone admits are outdated. This new plan will last only one year and will then be replaced by a plan based on the 2000 census figures. When previously forced by this Court to redraw the Twelfth District in 1998, the General Assembly created a plan which garnered the approval of this Court and was pre-cleared by the Justice Department. Indeed, North Carolina's current Congressional delegation was elected under that plan in the 1998 general elections. Were the General Assembly to simply readopt the 1998 plan, the additional expenditure of legislative time, effort, and resources might be minimized. Otherwise, for the fifth time in 10 years, North Carolina's legislature must undergo the arduous task of reaching a consensus on the divisive and inherently political issue of congressional redistricting.